**BOWLES, Administrator, Office of Price Administration, v. BIBERMAN BROTHERS, Inc.**

Civil Action No. 3710.

District Court, E. D. Pennsylvania.

July 19, 1945.

Robert J. Callaghan, Dist. Enforcement Atty., and Sydney M. Friedman, both of Philadelphia, Pa., for plaintiff.

Shapiro & Shapiro, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This action for injunctive relief and treble damages was brought by the Administrator of the Office of Price Administration pursuant to Sections 205(a) and 205(e) of the Emergency Price Control Act of 1942, 56 Stat. 23, as amended, 50 U.S.C.A.Appendix § 925(a) and (e).

It is alleged that the defendant, Biberman Brothers Inc., a dress manufacturer, has engaged in acts and practices which constitute a violation of Section 4(a) of that Act, 50 U.S.C.A.Appendix § 904(a), in that it has violated Maximum Price Regulation No. 287 (7 F.R. 10460), as amended and revised,[1] which establishes, inter alia, maximum prices for women's and misses' dresses sold by manufacturers other than at retail. The specific provision of the Regulation (hereinafter referred to as MPR 287) which is involved here is set out in the margin.[2]

The cause came on to be heard by the Court without a jury, and, at the conclusion of the plaintiff's case, defendant moved to

---

[1] MPR 287 (8 F.R. 9122), as amended, 2 Pike & Fischer, OPA Consumers' Goods Desk Book, Page 28, 101.

[2] Section 10(b) is as follows:

"Rule 2: Sales at selling price lines different from those listed on the pricing chart. A manufacturer may, at his option, sell a garment in a selling price line different from those listed on his pricing chart: Provided, the garment contains the minimum allowable cost for the selling price line: And provided also, That the selling price line is not higher than the highest selling price line listed on his pricing chart in effect on the date of delivery for a garment of the same category number. The maximum allowable margin for the optional selling price line is the maximum allowable margin listed on the pricing chart for a garment of the same category number in either the next higher or the next lower selling price line, whichever margin is lower. The minimum allowable cost is calculated by multiplying the optional selling price line by the lower maximum allowable margin thus selected and subtracting the result from the optional selling price line.

"If the manufacturer selects a selling price line lower than the lowest selling price line listed on his Spring Pricing Chart for a garment of the same category number, he must use, as his maximum al-

dismiss reserving the right to proceed in the event the motion is denied. Rule 41(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The broad issue raised by the action is whether the defendant violated MPR 287. This question involves the construction of a written agreement entered into by and between the Philadelphia Waist and Dress Manufacturers' Association, of which defendant is a member, the International Ladies' Garment Workers' Union, and the Joint Board of Waist and Dressmakers' Union of Philadelphia.

Asserting that the defendant overcharged on certain garments, plaintiff seeks injunctive relief as well as treble damages. The legal argument on the collateral issue relating to injunctive relief is, as I said in Bowles v. Katz, 61 F.Supp. 333, addressed to the exercise by the court of its discretion to grant or refuse the relief prayed for. The matter of damages, in this case, depends upon the construction of Section 10(b) of MPR 287, hereinafter referred to as Rule 2.

The plaintiff's evidence and the stipulations of the parties disclose the following circumstances.

For several years prior to June, 1943, the defendant, as a member of the Philadelphia Waist and Dress Manufacturers' Association, had been paying to its employees wage rates pursuant to a contract entered into by the Association and certain unions on September 12, 1940. In June, 1943, a dispute arose between the parties to the agreement regarding the right of the employees to a higher set of wage rates. Under the provisions of this agreement,[3] the dispute was referred to the Impartial Chairman for the Industry, who rendered a decision in writing on June 28, 1943. The Impartial Chairman held that because of a shift in the price lines of garments manufactured by the industry covered by the agreement, the employees were entitled to an additional amount of compensation for their work, and this amount was fixed at 8½ per cent of the basic wage rates. Defendant thereafter paid its employees pursuant to the decision of the arbitrator, and considered the 8½ per cent in its calculation of "direct labor costs" under the provisions of Section 30(a) (10) of MPR 287, set out in footnote 2, thus passing it on to the ultimate consumer.

The propriety of this action is strongly contested by the Administrator. He contends that the 8½ per cent adjustment or increase may not be included as an item of "direct labor costs," on the grounds that (1) the contract under which the new rate was granted did not provide for an unconditional increase of a fixed amount or per cent, and (2) the arbitrator erred in his construction of Clause 44, which, it is asserted, does not provide for an increase on the ground on which the Impartial Chairman acted.

The defendant is willing to admit that, if the 8½ per cent wage adjustment or increase is not allowable as an item of "direct labor costs", then it has violated the Regulation. It contends, however, that, as a matter of law plaintiff may not recover the damages he seeks because he cannot show the maximum selling price for the garments which are alleged to have been sold above the ceiling prices; therefore it contends, plaintiff may obtain, at most, an injunction, but it is asserted, plaintiff's evidence does not disclose facts which would warrant this Court in exercising its discretion to grant that relief.

---

lowable margin, the maximum allowable margin of that lowest selling price line."

Section 30(a)10 reads, in part, as follows:

" 'Direct labor costs' shall be calculated on the basis of wage rates paid by you on March 31, 1942, plus any subsequent increase thereto pursuant to a collective bargaining contract or other wage agreement, which contract was entered into on or before July 1, 1942, and provides for an unconditional increase of wage rates of a fixed amount or per cent. If you paid wage rates at the time of cutting in excess of the above basis, proper downward adjustments shall be made in calculating the labor costs for the garments."

[3] Clause 44, the pertinent provision here, provides:

"The wage scales, hours and prices on garments or articles manufactured by the members of the Association other than those for which this agreement is intended shall be governed by the provisions of the Union agreements in the respective industries for such other garments or articles. The present special arrangement concerning rayon garments shall continue.

In the event of any dispute under this paragraph, the matter shall be referred to the Impartial Chairman, whose decision shall be binding."

Taking up the determinative issue in this case, whether there was a violation of the Price Control Act, it must be noted at once that under the Pennsylvania law, both common and statutory, "An arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact, and his award will not be reviewed or set aside for mistake in either." Goldstein v. International Ladies' Garment Workers' Union, 1938, 328 Pa. 385, 389, 196 A. 43, 46; accord, Britex Waste Co., Ltd., v. Nathan Schwab & Sons, Inc., 1939, 139 Pa.Super. 474, 480, 12 A.2d 473; Pierce Steel Pile Corp. v. Flannery, 1935, 319 Pa. 332, 339, 179 A. 558, 104 A.L.R. 706; Patriotic Order Sons of America Hall Ass'n v. Hartford Fire Insurance Co., 1931, 305 Pa. 107, 116, 157 A. 259, 78 A.L.R. 899; see also Moyer v. Van-Dye-Way Corp., 3 Cir., 1942, 126 F.2d 339. There can be no doubt, therefore, that the arbitrator's decision here involved was, and is, as binding upon the defendant as though it were a final, unappealable judgment. Whether Clause 44 of the contract actually did provide for an increase in wage rates for the reason given by the Impartial Chairman, and whether the facts warranted the rate granted, are questions forever closed to the parties to the agreement.

To my mind, a construction of Clause 44 here and now is unnecessary and inappropriate. The arbitrator's construction is, by the express terms of the contract, and by law, now a part of the contract itself. His construction is a final declaration as to the meaning of the Clause as intended by the parties to the agreement, which intention should control the process of interpretation by this Court.

The immediate question, however, is not whether Clause 44 was construed correctly, but whether the increase granted by the Impartial Chairman may be considered as an item of "direct labor costs" within the meaning of Section 30(a) (10) of MPR 287. Insofar as increases subsequent to March 31, 1942, are concerned, that Section sets up four conditions which must be satisfied in order that an increased wage rate be considered an item of direct cost: the increase must be made (1) pursuant to a collective bargaining contract or other wage agreement, (2) which was entered into on or before July 1, 1942, and which provides (3) for an unconditional increase (4) of a fixed amount or per cent.

It is not disputed that the collective bargaining contract here in controversy was entered into before July 1, 1942. Moreover, I think there can be no doubt that the increase or adjustment was granted pursuant to a collective bargaining agreement— whether it was granted rightly or wrongly by the arbitrator is irrelevant.

Although the plaintiff asserts that the agreement does not provide for an increase unconditional in nature, his argument is, in truth, directed to whether or not Clause 44 embraces the ground on which the new rate was granted. However, as found by the Impartial Chairman, Clause 44 contemplates a change in wage rates coincident with a transfer of product or type of work during the life of the contract. Moreover, the clause makes it an obligation on the part of the defendants to pay, and on the part of its employees to accept, rates applicable to the product they now produce, which rates they would have been required to pay, and accept, had they produced such products, in the manner they now produce them, at the time the contract went into effect. In addition, he determined that the wage rates for the different price lines had been established for years in the industry. In my opinion, therefore, the collective bargaining agreement here involved does provide for an unconditional change in wage rates under the circumstances of this case, and the change which it contemplates was, and is, obligatory and without reservation.

Finally, plaintiff contends that the agreement does not provide for an increase of wage rates of a fixed amount or per cent. The agreement, however, specifically provides that the wage scale for garments other than those for which the instant agreement was intended should be governed by the provisions of the agreements for such other garments. As construed by the Impartial Chairman, the parties intended this provision to apply in the situation which exists here. Further, he determined that there was established in the industry a definite wage differential which the manufacturers had agreed to maintain and that that rate had long been established at 15%. It is true that Clause 44 does not state explicitly the fixed amount or per cent of the increase or adjustment, but it accomplished the same result by reference. The fact that the Impartial Chairman fixed a rate lower than $8\frac{1}{2}\%$ is, in my opinion, not decisive. If defendants were required to pay 15%

618

rather than 8½%, and could include that amount in their computation of "direct labor costs", certainly they could include the lesser amount. It is interesting to note that the arbitrator fixed a lower percentage than that established in the industry solely because the Union desired a market-wide, uniform result, and therefore was willing to sacrifice part of that which it might have otherwise obtained.

For the reasons stated, it is my opinion that the additional 8½% wage rate granted by the Impartial Chairman was includable as an item of "direct labor costs" within the meaning of Section 30(a) (10) of MPR 287.

Because of the view I have taken, it is not essential that this Court rule on the collateral questions relating to injunctive relief and damages. However, since these matters have received so much attention from the parties, I am constrained to discuss them briefly. I am moved to consider the question of damages particularly, for it involves an interpretation of Rule 2 and is of great importance to the efficient enforcement of the Price Control Law. I do so also because in my opinion this section as presently stated imperatively requires clarification and implementation by the Administrator so that those who function under it, the enforcement officials and the manufacturers alike, may have a clear and concise understanding of the requirements the Rule imposes and its legal effect.

As to the injunction:

Even assuming that the adjustment ordered by the Impartial Chairman is not an item of "direct labor costs" and assuming that therefore the defendants have violated the Regulation, it is my opinion that the circumstances would not warrant this court in issuing an injunction. Plaintiff's case does not disclose evidence of violations of such character and degree of wilfulness, nor of such continuity and duration as to justify the conclusion that the defendant will, in the future, violate the Price Control Law unless the injunctive relief sought is granted. Brown v. Standard Oil Co., D.C., 52 F.Supp. 1022. Moreover, there is a failure of plaintiff's evidence to show that the inclusion of the 8½% item by the defendant in its computation of direct costs was done with any intention inconsistent with the spirit of price controls; there is no evidence of an attempt on the part of the defendant to evade the law, nor is there evident a negligent failure on its part to conduct its business in accordance with the law. It is conceded that the dress manufacturers of Philadelphia and their employees have been operating under contracts and practices which have established the Impartial Chairman as the virtual "czar" of the industry with powers akin to those exercised by the "czar" of baseball. As already stated, under the facts and the law, the decision of the Impartial Chairman was final and absolutely compelling on both the employer and labor. Moreover, it is admitted by the plaintiff that failure of the defendant and other employers to pay the rate ordered by the arbitrator would probably result "in a strike in the industry with the resultant chaos". Furthermore, defendant, being bound to pay the new rate, in good faith and on the advice of counsel, considered that it was a proper item of "direct labor costs." Although the increase was ordered on June 28, 1943, it was not until September 11, 1943, that the members of the Association were advised by the Office of Price Administration not to include the rate in their calculations, and not later than January 29, 1944, the defendant stopped the practice. In the face of these facts, for the Court to rule that the defendant was guilty of wilful intent to violate the Price Control Laws would be utterly contrary. As additional evidence of the good faith of the defendant plaintiff's evidence discloses that one style was sold by it substantially below the maximum price as computed by the Office of Price Administration.

As to damages:

With respect to plaintiff's claim for damages under Section 205(e) of the Act, it is obvious that, in order to assess damages—in order to fix the amount of the alleged overcharges—it is essential to know, or to be able to determine, the maximum selling prices. Plaintiff contends that Rule 2 provides a method for determining a maximum selling price while defendant urges that the Rule cannot be used for such a purpose.

Upon full consideration of the parties' contentions, I am of the opinion that Rule 2 was designed to provide a method for ascertaining a minimum allowable cost, and that only, and was intended to cover only a case where a manufacturer, having established price lines filed with the OPA,

exercised his option to sell at an intermediate price line. No such situation exists here, and Rule 2 is inapplicable.

Consequently, damages cannot be calculated or awarded, since plaintiff has conceded that there is no other regulation applicable to the facts of this case, under which a maximum selling price (an indispensable element in the fixing of damages) may be determined or ascertained.

For the reasons stated, the defendant's motion to dismiss is granted.